Peter **SHRINER, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 48A02–0410–CR–904.

Court of Appeals of Indiana.

June 21, 2005.

Christopher A. Cage, Anderson, for Appellant.

Steve Carter, Attorney General of Indiana, Stephen Tesmer, Deputy Attorney General, Indianapolis, for Appellee.

## OPINION

ROBB, J.

Peter Shriner was found guilty by a jury of child molesting as a Class C felony.

Shriner now appeals his conviction. We affirm.

### Issues

Shriner raises two issues for our review, which we restate as follows:

1. Whether the trial court properly refused to declare a mistrial or admonish the jury to ignore Shriner's testimony after Shriner referred to a lie detector test during his direct examination; and

2. Whether the trial court properly allowed the State to impeach Shriner with a prior inconsistent statement he made under oath outside the presence of the jury.

### Facts and Procedural History

Shriner is the step-grandfather of A.I. Shriner's wife, Penny Shriner, is the paternal grandmother of A.I. Penny and A.I. had a close relationship, and A.I. spent nearly every weekend with her grandmother and Shriner at the Shriners' home. When A.I. spent the night with the Shriners, she usually slept alone in one of the bedrooms. A.I. testified that sometime when she was between the ages of eight and ten, Shriner began sneaking into her room at night. A.I. stated that Shriner would climb into bed next to her, reach inside her pants, and fondle her vagina. A.I. indicated that this pattern of behavior continued for several years. A.I. eventually told her mother that Shriner was molesting her, and her mother took her to see a doctor. The doctor reported to Child Protective Services that Shriner was abusing A.I. and an investigation of A.I.'s accusations was begun.

During the investigation of A.I.'s accusations, Shriner met with the police. At this meeting, Shriner denied having molested A.I. The police asked Shriner if he would

take a lie detector test and Shriner said that he would be willing to take such a test. When the police later afforded Shriner the opportunity to take a lie detector test, Shriner refused to take the test. Shriner was eventually arrested and charged with child molesting.

Shriner's jury trial began on July 27, 2004. During the trial, Shriner testified. On direct examination, when asked if he molested A.I., Shriner stated, "No, sir. I wouldn't do that. It's against everything I believe in." Tr. at 174. The following exchange then took place between Shriner and his attorney:

Q. The police contacted you. Do you remember that?

A. Yeah, it was a couple of months later.

Q. Do you remember that first contact with the detective?

A. Yes, it was on my voice mail at home, the officer said I'm Stan Brown or something like that, and I would like to talk to you if you would please give me a call and set up an appointment, I would appreciate it. Which, of course, soon as I hear that, I did.

Q. You did what?

A. I called him right back.

Q. You called him right back?

A. Yes.

Q. What did you tell him in response to his questions?

A. Well, he asked me to come up and see him, so I had Jim drive me up there. And we went in to an interview room and he basically asked me the same thing, did I do it and I told him no.

Q. You were cooperative.

A. Yes, sir.

Q. Did you offer a second interview?

A. *Yes, sir. He also asked me if I'd take a lie detector test. I told him yes I would.*

Tr. at 175–76 (emphasis added). The State raised no objection to Shriner's mention of a lie detector test. Shriner's counsel completed his direct examination of Shriner shortly after this exchange. The trial court then excused the jury and a bench conference was held. During this conference, the State requested a short recess to consider its options for dealing with Shriner's reference to the lie detector test. The trial court granted the State's request for a recess.

Upon returning from recess, and with the jury still out of the courtroom, the trial court went back on the record. The trial judge, Judge Dennis Carroll, related for the record that during the recess he spoke with counsel for the State and Shriner's counsel about how to handle Shriner's reference to a lie detector test. Judge Carroll stated that he was going to allow the State to ask Shriner on cross-examination whether he had taken the lie detector test the police offered him, and whether he would be willing to take a lie detector test that day. The State, wishing to avoid being surprised by Shriner's testimony, then asked Judge Carroll if it could ask Shriner some questions outside the presence of the jury relating to whether Shriner had taken a polygraph exam with regards to this case. The trial court allowed the State to ask its questions and the following exchange ensued:

Q. Sir, have you ever taken a polygraph examination in connection with the facts of this case?

THE COURT: Or voice stress.

Q. Or a voice stress, any kind of a truth measuring type of an examination?

A. No, sir.

Q. Never?

A. No, sir.

Tr. at 181.

Shriner's counsel then asked to approach the bench where a bench conference was held. During this conference, Shriner's counsel informed Judge Carroll that Shriner had in fact taken a polygraph test in connection with this case at his attorney's request, and, therefore, his statement that he had not taken a polygraph test was untrue. The parties then began to consider whether the State should be allowed to impeach Shriner on his testimony that he had not taken a polygraph exam with regards to this case. Judge Carroll ultimately determined that the State should be allowed to impeach Shriner on this testimony.

The jury was brought back into the courtroom and the State proceeded to cross-examine Shriner as follows:

Q. Mr. Shriner, you testified earlier that molesting your grandchild [A.I.] would be completely against everything you stand for, is that correct?

A. Yes, sir.

Q. Those were your words. You also stand for telling the truth under oath.

A. Yes, sir.

Q. That's important to you?

A. Yes, sir.

Q. So when the Judge, when you walked up to that chair and you sat down and you raised your hand and the Judge said some words to you and you said I do, you understood what you were saying there, right?

A. Yes, sir.

Q. And you understand how important credibility is in the big picture of this case, right?

A. Yes, sir.

 * * *

Q. You mentioned to the jury during your testimony earlier that Officer Brown offered you the opportunity to take a polygraph and you said that's fine.

A. Yes, sir.

Q. Do I have that correct?

A. Yes, sir.

Q. And that was your testimony earlier, is that correct?

A. Yes, sir.

Q. Officer Brown, you never took a polygraph from Officer Brown, is that correct?

A. That's correct.

Q. Do you want to take one tonight?

A. No, sir.

 * * *

Q. All you have to do, Mr. Shriner, is say the word and we'll make it [a polygraph examination] happen. We'll get the operator available, we'll get the equipment available, we'll get you there and we'll allow you the opportunity to take that examination that you wanted to take from Officer Brown, apparently. You can do that tonight. Do you understand that?

A. Yes, sir.

Q. Do you want to do it?

A. Under advisement from my counsel, no sir.

Q. What do you mean under advisement from your counsel?

A. My counsel had advised me not to take one, it's not admissible in court.

 * * *

Q. You understand, with all due respect to your attorneys, it's not their call, it's yours. Do you understand that?

A. Yes, sir.

 * * *

Q. You don't want to take one [a polygraph examination]. Right?

A. Under advisement of my counsel, no sir.

Q. If you change your mind on that, Mr. Shriner, your attorneys know how to get a hold of me tonight.

A. Yes, sir.

Q. And we can do that. Do you understand that?

A. Yes, sir.

\* \* \*

Q. I mentioned earlier, Mr. Shriner, that you understand and appreciate the meaning of the oath and that you understand that you were sworn in to tell the truth to this jury. Do you recall that question and answer?

A. Yes, sir.

Q. You also understand how important your credibility is to the jury's determination in this case probably.

A. Yes, sir.

Q. We were out of the courtroom for approximately 25 minutes and you were asked a couple of questions under oath while the jury was not here. Do you recall that?

A. Yes, sir.

Q. I asked you, I think my exact words were, have you ever taken a polygraph examination in connection with this case. Do you recall that question?

A. Yes, sir.

Q. What did you say?

[Shriner's counsel raises an objection]

Q. What'd you say?

A. I said no.

Q. Were you at all confused by that question? Again, the question was, have you ever taken a polygraph examination in connection with this case. Right? That was the question.

A. Yes.

Q. You answered no. Was that a truthful answer?

A. No, sir.

\* \* \*

Q. So when you said no to a fairly simple question and the answer should have been yes, what was going on? Let me ask a direct question: were you being truthful?

A. At the time I thought I was, but obviously, I wasn't.

Q. The question was, have you ever taken a lie detector or voice stress or something in connection with this case. That was the question, right?

A. Yes, sir.

Q. Your answer was no.

A. Yes, sir.

Q. Correct?

A. Yes, sir.

Q. You have, in fact, taken such an examination in connection with this case, right?

A. Yes, sir.

\* \* \*

Q. So, the answer to my question should have been yes.

A. Yes.

Q. So, I mean, you were lying to the Judge, right?

A. Yes, sir.

Q. And you were under oath when you did that, right?

A. Yes, sir.

Tr. at 202–03, 206–12. During this exchange, Shriner's counsel raised several objections. At the conclusion of the trial, the jury found Shriner guilty of child molesting as a Class C felony and this appeal ensued.

*Discussion and Decision*

Shriner argues that his conviction should be reversed because (1) the trial court should have declared a mistrial or admonished the jury to disregard his testimony concerning a lie detector test; and (2) the trial court should not have allowed the State to impeach him with a prior inconsistent statement. We disagree.

## I. Failure to Declare a Mistrial or Admonish the Jury

 Shriner first argues that when he mentioned a lie detector test during his direct examination testimony, the trial court should have either declared a mistrial or admonished the jury to ignore his testimony. "In general, a reference to a polygraph examination without an agreement by both parties is inadmissible and grounds for error." *Glenn v. State*, 796 N.E.2d 322, 325 (Ind.Ct.App.2003), *trans. denied.* Proof of the fact that a polygraph examination was taken or refused is, in the absence of waiver or stipulation, inadmissible in a criminal prosecution. *Id.* "A defendant is prohibited from stating he offered to take a polygraph test and the State is equally prohibited from referring to such a test." *Couch v. State*, 527 N.E.2d 183, 185 (Ind.1988). Here, any evidence concerning Shriner's taking or offering to take a polygraph examination was inadmissible because the parties never agreed that this evidence should be admissible. However, we have also stated that in some narrow circumstances, a party may open the door to admission of polygraph evidence. *Majors v. State*, 773 N.E.2d 231, 238 (Ind.2002).

 Shriner contends that because any evidence regarding a polygraph examination was inadmissible at his trial, the trial court should have declared a mistrial when he mentioned a lie detector test during his testimony. A mistrial is an extreme remedy and should only be used when no other curative measure will rectify a situation. *Glenn*, 796 N.E.2d at 325. "A mistrial should be granted where the accused, under all the circumstances, has by such trial proof been placed in a position of grave peril to which he should not have been subjected." *Conn v. State*, 535 N.E.2d 1176, 1180 (Ind.1989). We afford great deference to a trial court's decision whether to grant a mistrial because the trial judge is in the best position to gauge the surrounding circumstances of an event and its impact on the jury. *Williams v. State*, 755 N.E.2d 1128, 1132 (Ind.Ct.App. 2001), *trans. denied.* Therefore, we review a trial court's decision whether to grant a mistrial only for an abuse of discretion. *Id.*

Here, after Shriner mentioned a lie detector test during his testimony, Shriner's counsel did not make a motion asking that the trial court declare a mistrial. In fact, Shriner could not have made such a motion because he was the one who introduced this evidence. The State could have made a motion for a mistrial because Shriner's comment about the lie detector test was prejudicial to its case, but it did not do so. Even if Shriner had made a motion for a mistrial, that motion should not have been granted. We have previously stated that "[a] defendant who creates his own cause for mistrial presents no error." *Reynolds v. State*, 625 N.E.2d 1319, 1321 (Ind.Ct. App.1993), *trans. denied.* Because Shriner first mentioned that he offered to take a lie detector test, Shriner created his own cause for mistrial, and, thus, presents no error that would justify granting a mistrial. Therefore, the trial court did not err in refusing to grant a mistrial.

 Shriner next argues that rather than allowing the State to ask him whether he took the polygraph examination that the police offered him and wheth-

er he would be willing to take a polygraph exam that day, the trial court should have admonished the jury to ignore his testimony regarding the lie detector test. Generally, when the trial court admonishes the jury to disregard inadmissible evidence regarding a polygraph examination, the prejudicial impact of that · evidence may be sufficiently mitigated. *Glenn,* 796 N.E.2d at 325. The problem with evidence concerning a polygraph examination is that it has the potential to cause a jury to make erroneous inferences that prejudice a certain party. Typically, we are faced with a situation where the State or a witness for the State refers to a polygraph examination. In this situation, the jury often infers, sometimes erroneously, that the defendant took the exam and failed it or refused to take the test because he was being untruthful. This inference has a prejudicial impact on the defendant because it causes the jury to view him or her as untruthful. However, here, the defendant referred to a polygraph examination. When the defendant refers to a polygraph exam, the jury is led to infer, perhaps erroneously, that the defendant took the test and passed or was not given the opportunity to take the exam because he was not guilty. This inference causes the jury to view the defendant as truthful, and, thus, has a prejudicial impact upon the State.

When faced with a situation where either the State or the defendant has referred to a polygraph examination, the trial court must try to prevent the jury from drawing a false inference from this evidence. One way a trial court can do this is by admonishing the jury to ignore the evidence concerning a polygraph examination. Here, neither Shriner nor the State requested that the trial court admonish the jury to disregard Shriner's testimony concerning a lie detector test. The trial court could have *sua sponte* admonished the jury to ignore Shriner's testimony, but it did not do so. Instead, the trial court allowed the State to ask Shriner whether he took the polygraph exam that the police offered him and whether he would be willing to take a polygraph test that day. Based on *Willoughby v. State,* 552 N.E.2d 462 (Ind. 1990), we believe that the trial court's actions in this instance were proper.

In *Willoughby,* the defendant, Willoughby, was charged with the murder of an Indianapolis police officer. The investigation of the murder took place over several years. During the course of the investigation, Willoughby was given polygraph exams in both 1983 and 1985. Prior to trial, the trial court granted the State's motion in limine barring Willoughby from referring to the 1983 and 1985 polygraph exams. Despite the State's motion in limine, during his direct examination, Willoughby referred to both the 1983 and the 1985 polygraph tests and indicated that a police detective had stated that he passed the 1983 exam. The State objected to Willoughby's testimony. On rebuttal, the trial court allowed the State to introduce evidence that showed that "the results of the 1983 polygraph were inconclusive, that the defendant failed the 1985 polygraph, and that Detective Wilson never said the defendant passed the 1983 polygraph." *Id.* at 469. Willoughby was ultimately convicted of murder.

Before our supreme court, Willoughby argued that the trial court erred in permitting the State to present rebuttal evidence on the two polygraph exams taken by Willoughby. The court began by noting that absent some form of stipulation or waiver, the mere mention that a polygraph examination was administered is inadmissible, as are the results of any such exam. *Id.* The court noted that Willoughby introduced the topic of polygraph exams, and that

"[h]is statements could mislead the jury into thinking that his truthfulness was verified by a polygraph examination, when in fact there was evidence that its results were inconclusive." *Id.* The court stated, " 'A defendant may not open an issue and have it closed at his convenience.' " *Id.* (quoting *Kalady v. State,* 462 N.E.2d 1299, 1309 (Ind.1984)). The court concluded that "[o]nce the defendant opened the door to the proscribed evidence he waived any objection to the admission of the polygraph results. The trial court did not err in permitting the State to present the polygraph results in rebuttal." *Id.*

Therefore, *Willoughby* suggests that when a defendant refers to a polygraph exam, the trial court is not limited in how it chooses to prevent the jury from drawing a false inference. To prevent a jury from making an erroneous inference, *Willoughby* indicates that besides simply admonishing the jury to ignore the defendant's testimony, the trial court can go so far as to allow the State to introduce rebuttal evidence, including the actual results of a polygraph exam taken by the defendant.

Here, Shriner testified that he told the police that he was willing to take a lie detector test. This could have misled the jury into thinking that Shriner took a polygraph examination and passed it, or that he was innocent and wanted to take a polygraph test but the police would not give him the test. Either of these inferences drawn by the jury would have had a prejudicial impact on the State. To prevent the jury from drawing a false inference prejudicial to the State, the trial court could have admonished the jury to ignore Shriner's testimony about the lie detector test, but it did not do this. Instead of admonishing the jury, the trial court allowed the State to first ask Shriner whether he took the polygraph exam that the police offered him. Shriner stated that he did not take this polygraph exam. The trial court then allowed the State to ask Shriner if he was willing to take a polygraph examination that day, and Shriner testified that he was not. By allowing the State to ask these questions, the trial court afforded the State a chance to rebut the prejudicial impact caused by Shriner's testimony. Pursuant to *Willoughby,* the trial court properly allowed the State to ask Shriner these questions. Therefore, the trial court's actions in this instance were proper and it did not err in failing to admonish the jury to disregard Shriner's testimony about a lie detector test.

## II. Impeachment

■ Shriner next contends that the trial court erred in allowing the State to impeach him with his prior inconsistent statement given under oath. Shriner made the statement at issue at trial while the jury was excused from the courtroom. Prior to making the statement, Shriner, during direct examination, testified that he told the police that he was willing to take a lie detector test. Shriner's counsel quickly finished his questioning, the jury was excused from the courtroom, and the court took a recess to allow the State to consider its options for how to deal with Shriner's reference to a lie detector test. Upon returning from recess, the trial court allowed the State to ask Shriner whether he had ever taken a polygraph examination in connection with this case. Shriner responded that he had not. Shriner's counsel then approached the bench and informed Judge Carroll that Shriner had in fact taken a polygraph test in preparation for this trial. Judge Carroll determined that Shriner had lied under oath and that the State should be allowed to impeach Shriner with this statement. On cross-examination, the State asked Shriner about his testimony, and Shriner was

forced to admit that his earlier statement that he had not taken a polygraph test in connection with this case was false.

Shriner first argues that his testimony concerning whether he had taken a polygraph test in connection with this case was a collateral matter and that impeachment upon collateral matters is impermissible. Shriner notes that his counsel, in preparation for trial, ordered the polygraph exam that he took. The test was not ordered by the police or part of a police investigation. Based on this, Shriner asserts that any evidence concerning whether he took a polygraph examination in connection with this case is a collateral matter.

■■■ Shriner is correct that impeachment upon collateral matters is impermissible. *Kien v. State*, 782 N.E.2d 398, 409 (Ind.Ct.App.2003), *trans. denied.* "The determination of whether a matter is collateral depends upon whether the offering party would be entitled to prove it as part of the case in chief, apart from the contradiction it supplies. In other words, the question is whether the evidence is admissible for any purpose independent of the contradiction of the witness." *Id.* A party may inquire into a collateral matter on cross-examination, but the questioner is bound by the answer he or she receives and may not impeach the witness with extrinsic evidence unless the evidence would be independently admissible. *Id.*

■■■ Evidence regarding whether Shriner took a polygraph examination in connection with this case is not a collateral matter because it is admissible for a purpose independent of simply contradicting Shriner. During direct examination, Shriner was asked whether he molested A.I. Shriner answered, "No, sir. I wouldn't do that. It's against everything I believe in." Tr. at 174. This statement raised Shriner's character as an issue in this case. Because character was an issue, the State

was entitled to present evidence reflecting on Shriner's character. The fact that Shriner lied under oath about whether he took a polygraph exam in connection with this case is evidence reflecting on his character, and the State was properly allowed to introduce this as evidence of Shriner's character. Additionally, when an accused individual takes the stand in his own defense he automatically raises the issue of his credibility as a witness. *Highley v. State*, 535 N.E.2d 1241, 1243 (Ind.Ct.App. 1989), *trans. denied* (quoting *Wells v. State*, 239 Ind. 415, 429, 158 N.E.2d 256, 263 (1959)). Here, Shriner's credibility as a witness was at issue because he took the stand in his own defense. Therefore, the State properly introduced evidence that Shriner lied under oath about not taking any polygraph tests in connection with this case as evidence of Shriner's credibility as a witness. Because the State introduced evidence that Shriner lied while under oath as evidence of his character and credibility as a witness, and not simply to contradict him, Shriner's testimony that he did not take any polygraph examinations in connection with this case was not a collateral matter and the trial court properly allowed the State to impeach Shriner with this prior inconsistent statement.

■■■ Shriner next argues that the State used his testimony that he did not take any polygraph examinations in connection with this case as an evidentiary harpoon and that the trial court erred in allowing the State to use this evidence to impeach him. "When evidence is used in a manner solely to prejudice a jury against the witness and is not material to the litigation, the evidence is referred to as an 'evidentiary harpoon' and its admission is improper." *Kien*, 782 N.E.2d at 409. Initially, we note that to the extent that this evidence can be considered an evidentiary harpoon, it was Shriner, and not the State,

that launched the harpoon when he referred to a lie detector test during his direct examination and then lied about not taking any polygraph tests in connection with this case. Regardless of this, Shriner's false testimony that he did not take any polygraph examinations in connection with this case was not an evidentiary harpoon because this evidence was material and was not used in a manner solely to prejudice the jury against Shriner. Both Shriner's character and his credibility as a witness were issues in this case and any evidence relating to these issues was material. The State introduced evidence that Shriner lied under oath about not taking any polygraph exams in connection with this case as evidence of Shriner's character and credibility as a witness. Therefore, this evidence was not used by the State as an evidentiary harpoon, and the trial court properly allowed the State to impeach Shriner with this evidence.

Shriner also argues that, pursuant to Indiana Evidence Rule 403, because the probative value of the evidence that Shriner lied under oath was outweighed by the danger of unfair prejudice this evidence might cause, the trial court should have excluded this evidence. Indiana Evidence Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ...." We agree with Shriner that evidence that he lied while under oath is prejudicial to him. However, Shriner conceded during cross-examination that credibility was a significant issue in this case. This case largely turned on whether the jury believed Shriner or A.I. Thus, the probative value of the evidence that Shriner lied while under oath outweighs its prejudice to Shriner. Therefore, the trial court's failure to exclude the evidence that Shriner lied under oath about not taking any polygraph examinations in connection with this case pursuant to Indiana Evidence Rule 403 was not erroneous.

*Conclusion*

The trial court did not err in failing to declare a mistrial because Shriner created his own cause for a mistrial. The trial court did not err in failing to admonish the jury to ignore Shriner's testimony about a lie detector test, and the trial court properly allowed the State to rebut the prejudicial impact caused by Shriner's reference to a lie detector test. We also hold that the trial court properly allowed the State to impeach Shriner with his prior inconsistent statement given while under oath. Shriner's conviction is therefore affirmed.

Affirmed.

FRIEDLANDER, J., and BAILEY, J., concur.